UNITED STATES DISTRICT COURT
For the
SOUTHERN DISTRICT OF NEW YORK

12 CV 6281

——————————————————————x

BRUCE JONES,

          Plaintiff,

    -against-

150 CENTRAL PARK SOUTH, INC., PATRICK
LAPPIN AND DANIEL R. KAPLAN

          Defendants

——————————————————————x

**VERIFIED COMPLAINT**

Case No.:_____

RECEIVED
U.S.D.C. S.D. N.Y.
CASHIERS

**DEMANDS A
TRIAL BY JURY**

Plaintiff, Bruce Jones, by his attorney, Felicia Nestor Esq., complaining of Defendants 150 Central Park South, Inc., Patrick Lappin and Daniel R. Kaplan alleges:

### NATURE OF ACTION

1.     This action is brought to remedy discrimination and harassment on the basis of race and/or color, and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964 U.S.C. §2000e *et. seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981A ("Title VII"); 42 U.S.C. §1981; and the Administrative Code of the City of New York § 8-101 *et. seq.* (the "Administrative Code" or "CHRL")

2.     Bruce Jones, a former employee of 150 Central Park South, Inc., suffered discrimination and harassment by defendants because of his race and/or color. Defendants also retaliated against Mr. Jones after he sent a letter to the Board of Directors of 150 Central Park South, Inc. in November 2010, complaining of these violations; this retaliation included, among other actions, unwarranted disciplinary warnings, an unwarranted termination and ultimately, forcing Plaintiff to resign his

position in September 2011 by changing his schedule to hours that Defendants knew Plaintiff could not work.

3.    Plaintiff seeks the following damages: declaratory relief, compensatory and punitive damages, attorneys' fees, and all other appropriate relief pursuant to federal and city law.

## JURISDICTION AND VENUE

4.    Jurisdiction of this court is invoked pursuant to 28 U.S.C. §1331 and 1343, and 42 U.S.C §2000e-5(f)(3).

5.    This Court's supplemental jurisdiction of Plaintiff's city law claims is invoked pursuant to 28 U.S.C. §1367.

6.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c) and 42 U.S.C. §2000e-5(f)(3) because Defendant 150 Central Park South, Inc. is located in the Southern District of New York, and the acts and omissions giving rise to the causes of action complained of occurred therein.

## ADMINSTRATIVE PREREQUISITES

7.    On November 29, 2011, Mr. Jones timely filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") complaining of the unlawful discriminatory and retaliatory acts alleged herein, and obtained Notice of a Right to Sue dated May 19, 2012, less than 90 days from the filing of this Complaint.

8.    Contemporaneously with the filing of this Complaint, Mr. Jones has mailed a copy, along with a letter of explanation, to the New York City Commission on

Human Rights and the Corporation Counsel of the City of New York, satisfying the notice requirements of the New York City Administrative Code §8-502(c).

## PARTIES

9.      Plaintiff Bruce Jones ("Plaintiff" or "Jones") is an African-American male residing in Old Bridge, New Jersey  who, at all times relevant to this lawsuit, performed work for Defendants, as an engineer, in the City and State of New York.

10.     Defendant 150 Central Park South, Inc. ("Defendant" or "150 Central Park South, Inc.") owns a cooperative apartment building with the name "Hampshire House", which is located at 150 Central Park South, New York, New York, 10019.   The principal executive office of Defendant is also located within the Hampshire House building.  Hampshire House has 197 apartments and, at all times relevant to this complaint, has had a staff of over 15 employees who work in the coop building.

11.     At all times relevant to this suit, individual Defendant Patrick Lappin was the General Manager, a tenant-shareholder at Hampshire House, and a member of the Board of Directors of 150 Central Park South, Inc.  At all times relevant to this suit, individual Defendant Daniel R. Kaplan was a tenant-shareholder at Hampshire House and Chairman of the Board of Directors of 150 Central Park South, Inc.  At all times relevant to this suit, Messrs. Lappin and Kaplan had the power and authority to hire, fire, direct and discipline employees of Hampshire House, were Plaintiff's employers within the meaning of 42 U.S.C. 2000(e) and CHRL § 8-102(5), and aided in and abetted the discrimination, harassment, and retaliation committed against Plaintiff.

## FACTUAL ALLEGATIONS

12.     Plaintiff Bruce Jones began working at Hampshire House in 2000 or 2001 as a contract worker for Deem Plumbing, Inc.  Hampshire House managers -- Engineering Supervisor Abraham Samadpour and General Manager Patrick Lappin -- appreciated the high caliber of Plaintiff's work at Hampshire House and repeatedly requested that Deem Plumbing send Plaintiff to answer Hampshire House's calls.

**Plaintiff's schedule at Hampshire House**

13.     In August 2003, Abraham Samadpour offered Plaintiff employment with Hampshire House.  Plaintiff informed Mr. Samadpour that he needed to continue to work his day job for Deem Plumbing, and Mr. Samadpour hired Plaintiff to work at Hampshire House for a part-time shift, working weekends and nights.  Plaintiff accepted and Patrick Lappin approved the hire.  This arrangement lasted for several years and there were many days when Plaintiff worked at Hampshire House for Deem Plumbing during the day, and then would change his uniform and work his evening shift as an engineer at Hampshire House for Defendants.

14.     Between August 2003 and September 2006, Mr. Samadpour was Plaintiff's direct supervisor; in September 2006, Gerard Bruno became Plaintiff's direct supervisor.  At all times relevant to the complaint, Mr. Lappin was Plaintiff's second-level supervisor.  As General Manager, Mr. Lappin is either the direct or second-level supervisor of every employee at Hampshire House.

15.     Within two months of being hired by Hampshire House, Plaintiff applied for and became a member of the New York Hotel and Motel Trades Council, AFL-CIO ("the Union"), which had a collective bargaining agreement ("CBA") with

Hampshire House, governing the employment of the Hampshire House engineers. Pursuant to the CBA, union members can only be terminated after a formal hearing and a decision by the Impartial Chairman ("IC") that Hampshire House managers have demonstrated that the employee has been the subject of progressive discipline and has been terminated for "just cause". Plaintiff also became a union delegate, and under the CBA, Hampshire House would have had to continue to employ Plaintiff pending a decision by the IC.

16.    These protections under the CBA enabled Plaintiff to maintain his job at Hampshire House as Mr. Lappin made one attempt after another, over several years, to terminate Plaintiff without cause. Mr. Lappin's attempts to terminate plaintiff were in violation of the progressive discipline protocols required by the CBA. Mr. Lappin's actions were discriminatory and retaliatory and violated federal and city laws against discrimination.

17.    Between 2003 and until he was forced to resign in 2011, Plaintiff continued to work a day job, first for Deem Plumbing and then for a different plumbing company, Pace Plumbing Corporation. Plaintiff's work hours for Hampshire House were generally limited to evenings and weekends.

18.    Defendants knew that Plaintiff had a day job because this was repeatedly discussed amongst Hampshire House employees including, but not limited to, the following illustrative examples:

a).    Plaintiff could not attend the weekly meeting of the Engineering Department, at which the next week's schedule was decided, because he was working at his day job; participants in that meeting were aware that Plaintiff

5

could not be scheduled for day shifts at Hampshire House because he was employed elsewhere during the day.   As a result, Plaintiff was assigned to work on days and/or hours when not working at his other job.

b).    When Plaintiff would enter the Engineering Department at the beginning of his evening shift at Hampshire House, Mr. Bruno often asked him about his other job - for example, whether he was tired from his plumbing work that day.

c.)    In 2005 and 2009, Plaintiff entered into agreements with another engineer, Lev Leykind, to which Mr. Lappin was a signatory, stating that Plaintiff and Mr. Leykind would each work a double shift on one of the weekend days.  During the discussions preceding these agreements, Plaintiff made it clear that he wanted to do this because he worked day shift, every weekday, for his plumbing job and having a double shift at Hampshire House on one weekend day would be the only way that Plaintiff would be able to have a full day off each week (during which he was working for neither his plumbing job nor Hampshire House.)

**The Hampshire House employee environment**

19.    The advertising for Hampshire House promises prospective tenants "old world character, charm, and elegance".  Characteristics of the Hampshire House environment indicate that remnants of de facto segregation are part of the "old world" that Defendants have preserved.

20.    At all times relevant to the complaint, the great majority of employees who comprised the "face" of the Hampshire House staff -- those employed in the

lobby as Bellmen, Doormen, Security Guards, or at the Front Desk -- were Caucasian or light-skinned Hispanics. Upon information and belief, the few dark-skinned employees who previously worked in these positions were not hired by Mr. Lappin. Eventually, Omar Varini, a light-skinned African-American, was the only person of color regularly scheduled to work in the lobby. Other employees of color at Hampshire House stated to Plaintiff that they were, and had long been, aware that Hampshire House managers positioned light-skinned employees in the front stations of the building.

21.     From Plaintiff's hiring in 2003 until he was forced to resign in 2011, he was the only African American working in the Engineering Department, which was located in the basement at Hampshire House. Upon information and belief, there had been one previous African-American mechanic who had a complexion similar to Plaintiff's working in the Engineering Department for Hampshire House. That employee had been hired in 2002 and resigned around the same that Hampshire House managers offered Plaintiff employment.

22.     Housekeeping was comprised mostly of dark-skinned, African American women and men, and brown-skinned Hispanic men.

23.     Most employees who worked in the packaging area of the Security Department, located in the basement, were brown-skinned and rarely came into contact with tenants of Hampshire House. When the Security Department was short-staffed for security guards, employees from the packaging area were called to work upstairs. Packaging employees told Plaintiff that Mr. Lappin routinely got upset when this occurred.

24.    When the Doorman Department was short-staffed, employees from the Housekeeping Department were called to cover the position.  Frequently, Tyrone Perkins, a dark-skinned housekeeper from Jamaica was called to perform this duty. On these occasions, Mr. Lappin became extremely upset.  Several times, a housekeeper named Eddie Torres, who was a brown-skinned Hispanic, was called to cover the doorman position.  On these occasions, Mr. Lappin also became upset, but less so than when Mr. Perkins was filling in at the doorman position.

**Discrimination against Plaintiff based on race and/or color**

25.    At all times relevant to the complaint, Mr. Bruno consistently gave Plaintiff good performance evaluations.

26.    Upon information and belief, however, beginning in 2006, Mr. Lappin began ordering Mr. Bruno to take unwarranted disciplinary actions against Plaintiff, often for actions that did not violate Hampshire House rules.  By 2007, these unwarranted actions included termination or threats of termination.

27.    Mr. Lappin terminated Plaintiff, at least twice, without warning.  Upon information and belief, Mr. Lappin did not terminate any other Hampshire House engineer without warning.

28.    In addition to having Mr. Bruno issue unwarranted disciplinary warnings, Mr. Lappin harassed Plaintiff by subjecting him to increased scrutiny and disdainful treatment.  On numerous occasions, employees notified Plaintiff that Mr. Lappin had called them to ask where Plaintiff was and what he was doing.  Mr. Lappin did not, as frequently, if at all, check up on Caucasian employees.  Mr. Lappin spoke derisively to Plaintiff in front of other employees and in a manner in which Mr. Lappin

8

did not speak to other employees. Mr. Lappin gave Plaintiff more onerous tasks than other engineers; as an illustrative example, Mr. Lappin had Plaintiff do more work than other engineers out on the terraces when it was raining. On one Sunday morning, Mr. Lappin instructed a doorman to park Mr. Lappin's car in the parking spot in front of Hampshire House where Plaintiff usually parked his car, explicitly so that Plaintiff could not park there.

29.     Regularly, when Plaintiff discussed the unwarranted disciplinary warnings and other mistreatment with Mr. Bruno, Plaintiff asked the union delegate at Hampshire House, Paul Malec, to be a participant and witness to these discussions, as per the accepted procedure. Generally, Mr. Bruno would shake his head and apologetically explain that he thought Mr. Lappin was "going crazy" or he didn't know why Mr. Lappin was having him take the disciplinary actions against Plaintiff.

30.     Upon information and belief, Mr. Lappin did not subject engineers who were Caucasian or light-skinned Hispanics to the same undeserved disciplinary actions, nor violate established progressive discipline protocols when disciplining them, nor treat them with the same disdain and disrespect in front of other Hampshire House employees.

31.     A number of Caucasian and light-skinned Hispanic employees repeatedly violated explicit Hampshire House rules before being issued any written warnings, and were subjected to lesser, if any, disciplinary actions than Plaintiff.

32.     On July 24, 2007, a private maid (not one of Hampshire House's staff), who was working in a tenant's apartment, notified the Hampshire House front desk that she had seen a waterbug in her employer's apartment. The front desk called

Plaintiff to remedy the situation.   Pest extermination is not part of the engineers' job description, and to Plaintiff's knowledge, no engineer had ever been called upon to handle a pest problem.

33.    Plaintiff searched throughout the basement for bug spray but found none.  Plaintiff called the maid, informed her there was no bug spray and said that he could bring her a broom.  She requested that he do so.  When Plaintiff arrived at the apartment, the maid explicitly informed him that the waterbug had disappeared and she did not know where it was at that time. Plaintiff gave her the broom so that she could use it to kill the bug *if and when* it reappeared.

34.    On July 30, 2007, with no warning, Mr. Lappin terminated Plaintiff "effective immediately" and called an emergency meeting with the union, seeking to have Plaintiff officially fired for not killing the bug himself.  Mr. Lappin did this without taking any of the progressive discipline steps required by the CBA, and despite the fact that Plaintiff explained he had attempted to help, but when he arrived at the apartment, the waterbug was no longer in sight.   *There had been no previous similar incidents, Plaintiff had not been issued any warnings, verbal or written, and there had been no intermediary disciplinary actions, such as suspension.*

35.    At the meeting to challenge the termination, Mr. Lappin could not demonstrate that termination of the Plaintiff was warranted or permissible under the CBA, and for that reason, Plaintiff remained in his position.

36.    Mr. Lappin knew the provisions of the CBA, knew he would not actually be able to terminate Plaintiff without cause, and engaged in this and other intermittent, groundless "terminations" in order to harass Plaintiff.  (However, once

Plaintiff complained of discrimination, Mr. Lappin immediately increased the frequency of these actions, in retaliation for Plaintiff's complaint, as described herein).

37.    By comparison, Caucasian employees were not subjected to harassment and were treated better. For example, one Caucasian engineer was written up repeatedly, between September 2007 and May 2009, for, inter alia, leaving jobs half finished; losing work orders and failing entirely to do an assignment; sleeping in the generator room while on duty; taking Hampshire House keys (from an apartment and a public space) home with him and not returning them for days; leaving a tenant's keys in the apartment door and leaving for the night; handling property in a tenant's apartment without permission; physically threatening another employee; failing to punch out when he left work; repeated absenteeism  from 2007 – 2009, including repeatedly using more than his allotted sick days, repeatedly coming in late for work and lunch breaks, even failing to show up at all after calling in late. This employee was repeatedly warned, intermittently written up and suspended several times, yet was never terminated until a large collection of repeated and ignored warnings *over the course of several years,* was first amassed.

38.    Other Caucasian and light-skinned Hispanic employees, also under Mr. Lappin's supervision, have not been terminated, and may never have even been written up after committing violations greatly exceeding anything Plaintiff may have been guilty of.  For example, upon information and belief:

a).    In violation of the rule that employees are prohibited from fraternizing with tenants, at least one employee had an affair with a tenant.

11

When managers learned of the violation, they issued explicit warnings to the employee. However, it was only when the employee violated multiple warnings that managers suspended him for one week.

      b).    One employee frequently allowed a homeless woman to sleep in a Hampshire House office, despite the rule that employees are not to invite anyone onto the premises of Hampshire House.

      c).    Several employees "lost" money from their banks, which they used to pay deliverymen on behalf tenants who would later reimburse Hampshire House, yet none were terminated.

      d).    Many employees used in excess of their allotted sick days without any disciplinary or pay consequences.

39.    Employees noticed that Mr. Lappin was subjecting Plaintiff to extraordinary scrutiny and disdainful treatment. They remarked to Plaintiff that Mr. Lappin was intent on punishing Plaintiff and trying to "get rid of" him.

40.    As a result, Plaintiff suffered humiliation in front of the other employees. He also suffered from stress and anxiety knowing that Mr. Lappin was looking for reasons to terminate him and that Mr. Lappin would not follow the established protocols in taking action against him.

41.    One month after the waterbug incident, in August 2007, Mr. Lappin had Mr. Bruno issue another warrantless disciplinary action against Plaintiff, ostensibly because Plaintiff did not have adequate tools to do the job. Hampshire House did not inform Plaintiff that engineers were required to provide their own tools. Previously, Plaintiff had brought some tools in, including a screwdriver that Mr. Lappin borrowed

and did not return; so, when Mr. Lappin asked for another screwdriver on August 20, 2007, Plaintiff did not have one because it was still in Mr. Lappin's possession. On August 28, 2007 Mr. Lappin had Mr. Bruno issue Plaintiff a verbal warning, including a threat of termination, for failure to have adequate tools.

42.     In the meeting pertaining to the disciplinary warning, Plaintiff requested a written list of tools that Hampshire House required engineers to provide for themselves. Hampshire House never provided one, demonstrating that Hampshire House did not have a policy of requiring engineers to have their own tools.

43.     In September 2008, Mr. Bruno issued Plaintiff a written warning for excessive sick days after Plaintiff took sick leave for the ninth day that year. The Hampshire House manual allots employees only seven sick days per year. Upon information and belief, many Caucasian and light-skinned employees have often exceeded their allotment of sick days with no warnings or write-ups being made.

44.     In August 2010, Mr. Lappin again terminated Plaintiff without any warning, without following progressive discipline protocols and without asking Plaintiff for any explanation about Plaintiff's purported transgression.

A Hampshire House tenant called the engineering department to have an engineer address potential leaks in her apartment because of a rainstorm that day. Plaintiff answered the call and learned that the job would require that he walk into the apartment. In order not to soil the floor, Plaintiff informed the tenant that he needed to get "booties" to cover his work boots, and that he would return. The tenant became angry, told Plaintiff to forget it and refused him entry.

45.     Upon information and belief, the tenant later made a complaint to Mr.
Lappin, after which Mr. Lappin had Mr. Bruno write a termination notice stating that
Plaintiff had refused to handle the tenant's service request. Mr. Lappin did not ask
Plaintiff for an explanation or initiate any investigation himself. Mr. Lappin did not
issue any warnings, or call the union to propose to terminate Plaintiff, as required by
the CBA. In violation of the CBA, Mr. Lappin ordered Plaintiff to leave immediately.

46.     Upon information and belief, the tenant made a reference to Plaintiff's
race in making the complaint to Mr. Lappin. Upon information and belief, some
person(s) involved in the investigation believed that race may have been a factor in
the tenant's groundless complaint against Plaintiff. Upon information and belief, Mr.
Lappin was deferential to this tenant, especially around this time, and took this action
against Plaintiff, in part, to satisfy the tenant, as well as based on Mr. Lappin's own
racial animus.

47.     Within several days, Union representative Larry McNeil came to
Hampshire House to have a meeting with Mr. Lappin because of Mr. Lappin's violation
of disciplinary protocols in terminating Plaintiff. An investigation began, during
which the tenant's personal driver, who had been witness to the discussion between
the tenant and Plaintiff, corroborated Plaintiff's versions of events multiple times, to
several different interviewers.

48.     During discussions about this matter, Mr. McNeil and Mr. Lappin got
into a lengthy and heated discussion about whether Mr. Lappin's actions were
motivated by discriminatory bias based on Plaintiff's race, because Mr. Lappin
continued to treat Plaintiff differently than he did the other employees.

14

49.    When Mr. McNeil sought to allow the tenant to address the discrepancy between her version of events and the contradictory explanations provided by both Plaintiff and the tenant's driver, Mr. Lappin rescinded the termination.

50.    In an attempt to appease the tenant, however, Mr. Lappin asked Plaintiff to stay away from Hampshire House for two weeks.  No other engineer, and perhaps no other employee, had ever been asked to do that.  It was not an actual suspension because Plaintiff received full pay, but Mr. Lappin would have been able to present it as such to the tenant.

51.    When Plaintiff returned to work, he was told not to leave the basement to answer service calls anywhere else in the building.  For several days, Mr. Lappin paid Mr. Malec to work overtime so that Mr. Malec could answer those calls for service instead of allowing Plaintiff to perform those duties.

52.    As a result of this incident, Plaintiff's level of humiliation, anxiety and stress greatly increased. Plaintiff began to withdraw and isolate himself from the other employees at Hampshire House, including Plaintiff's own stepson, who is also an employee at Hampshire House.  (Plaintiff's stepson is a light-skinned Hispanic). Plaintiff often avoided making eye contact and speaking with other employees, who remarked to Plaintiff that, in effect, he was becoming anti-social.

Mr. Lappin's continued harassment of Plaintiff caused Plaintiff to suffer increased mental anguish outside the confines of his job at Hampshire House. Plaintiff gained weight.  The stress and anxiety caused by Mr. Lappin's harassment resulted in Plaintiff's loss of enjoyment of life, and greatly harmed, even precluded the

intimacy that Plaintiff previously shared with his wife. Plaintiff greatly decreased his interactions with other members of his family who lived in the New York City area.

**Retaliation**

53.    At all times material hereto, Hampshire House's Employee Manual contained no information instructing employees what to do if they believed they were being discriminated against.

54.    On all or nearly all occasions when Mr. Bruno took an unwarranted action against Plaintiff, Plaintiff told Mr. Bruno that he believed he was being discriminated against by Mr. Lappin. These complaints to Mr. Bruno did not result in the harmful treatment against Plaintiff being halted.

55.    In early November 2010, a Cease and Desist letter was sent to Defendant Daniel R. Kaplan, and copies were sent to all other members of the Hampshire House Board of Directors, including Mr. Lappin. The letter informed and complained to the Board members about Mr. Lappin's continued harassment and discriminatory treatment of Plaintiff, and demanded that it be stopped.

56.    All employees, including Plaintiff, used the service entrance, when it was open, to enter and exit Hampshire House. Employees entering or exiting Hampshire House when the service entrance was closed, used the lobby entrance. The service entrance was locked at or before 11 p.m. every night and reopened in the morning, usually, but not consistently, around 7 a.m. Employees who began work at 7 a.m. often needed to enter the building through the lobby in order to punch the time clock before the start of their shift. On November 14, 2010 when Plaintiff arrived for work, a security guard named Manny Muniz conveyed to Plaintiff that Mr. Lappin no

longer wanted Plaintiff entering the building through the lobby. Adherence to that instruction would result in Plaintiff punching in late for work.

Later that same day, Plaintiff entered the lobby to check and replace lightbulbs, as needed and as per his required duties. Later, Mr. Muniz called Plaintiff and told him that it was cold in the lobby. Plaintiff returned to the lobby, investigated, found that the heat had been turned off, and rectified the problem. In addition to doing work in the lobby, Plaintiff spent a short time exchanging pleasantries with other staff members. Generally, and on that day specifically, Plaintiff spent much less time in the lobby than was regularly spent by some of the Caucasian engineers.

57. On November 16, 2010 Mr. Kaplan called Plaintiff's attorney to state that he received the cease and desist letter. Mr. Kaplan made no other comment.

58.    If Mr. Kaplan initiated any investigation at Hampshire House into Plaintiff's allegations of discrimination and harassment, it did not include any discussions with Plaintiff. No effective action was taken to stop Mr. Lappin's discriminatory actions against Plaintiff. Additionally, Mr. Kaplan did nothing to prevent the campaign of retaliation that Mr. Lappin initiated immediately thereafter. From that point on, Mr. Lappin had Mr. Bruno issue numerous, groundless disciplinary actions against Plaintiff, at an unprecedented rate, in order to harass Plaintiff.

59. Indeed, on November 16, 2010, Mr. Lappin had Mr. Bruno issue two unwarranted disciplinary warnings to Plaintiff. Upon information and belief, Mr. Lappin had Mr. Bruno issue a disciplinary warning asserting that a "random review"

of the lobby's security footage showed Plaintiff to have been in the lobby on November 14th.

60.    Upon information and belief, other employees spent more time in the lobby than Plaintiff and were given no warnings or other disciplinary actions. Upon information and belief, a review of videotape would show that Plaintiff spent less than in the lobby than other employees.

61.    Despite the fact that no Hampshire House manager had previously counseled Plaintiff about his appearance and no explanation was provided, the November 16th disciplinary warning about the lobby incident also threatened that "failing to maintain a professional level of appearance" could result in termination.

62.    Upon information and belief, Mr. Lappin had Mr. Bruno issue a second disciplinary warning to Plaintiff on November 16, 2010, for ostensibly having taken 12 sick days that year.

63.    At the time, numerous other employees had exceeded their sick day entitlement, some in excess of Plaintiff, but were not given warnings. Some were later given warnings written on Hampshire House stationary rather than on official disciplinary warning forms.  At least one employee told Plaintiff that when Mr. Lappin delivered the letter, he told the employee not to worry because he was just doing it to "cover his ass".  Another employee chided and complained to Plaintiff that it was only because Plaintiff objected to being the only one to get the disciplinary warning, that the employee was then given a letter by Mr. Lappin.

64.     Plaintiff was informed, in 2011, by Nellie Allison who worked in the Accounting Department, that the sick days on that disciplinary warning were based on a miscalculation, which overstated the number of sick days Plaintiff took that year.

65.     On December 7, 2010 another disciplinary action was initiated against Plaintiff, for allegedly leaving the building unattended and theft of company time, resulting in possible termination pending an investigation.  However, the warning was not issued once it was pointed out that :

a). Plaintiff only left temporarily to park his car in the spot that another Hampshire House employee would be vacating, and that other employees routinely did this or similar things;

b) Plaintiff was double parked in front of Hampshire House, remained within view of the Hampshire House camera, had his radio, and could have re-entered the building within 30 seconds if he was called; and

c) Mr. Lappin regularly had the one engineer on duty leave the building unattended in order to walk Mr. Lappin's dog in Central Park for 45 minutes or more.

66.     Despite the fact that the disciplinary warning was never officially issued, Plaintiff was "docked" a half hour of pay for this purported transgression.

67.     On December 20, 2010 Mr. Bruno conveyed to Plaintiff, Mr. Lappin's instruction that Plaintiff never leave the building through the front door.  Plaintiff's shift ended at 11 p.m., by which time the service entrance would be locked.

68.    Plaintiff informed Mr. Bruno that he would not leave through the back door after 11 p.m. unless all other employees received the same instruction. Hampshire House managers neither issued that instruction to other employees nor did they compel Plaintiff to be the only one to follow it.

69.    On the morning of Sunday, December 26, 2010, forecasters warned about a coming blizzard and advised people not to travel. Plaintiff wanted to have another Hampshire House engineer come in early to relieve him before the roads became dangerous.

70.    Plaintiff followed procedure and attempted to call his supervisor, Mr. Bruno, for permission to make the schedule change. Engineers cannot dial out, directly, from the basement and must place calls through the Hampshire House switchboard. Plaintiff placed a call to Mr. Bruno through the Hampshire House switchboard. When Mr. Bruno did not answer his phone, Plaintiff left a voice mail message for him.

71.    Wanting to ensure that he could find another employee to cover for him, Plaintiff then contacted another Hampshire House employee to find out if he could and would be willing to come in early.

72.    The employee agreed to relieve Plaintiff.

73.    Plaintiff placed several more calls to Mr. Bruno, but never spoke with him directly. It was the day after Christmas.

74.    While Plaintiff was waiting for Mr. Bruno's return call, Mr. Lappin suggested to Plaintiff that Plaintiff leave early because of the snow, but upon learning

that Plaintiff had already arranged to have another Hampshire House employee relieve him, Mr. Lappin became enraged.

75.     On January 4, 2011, Mr. Lappin had Mr. Bruno issue Plaintiff a disciplinary warning for having arranged to leave early on December 26, 2010. There is *no* mention in the disciplinary warning of the blizzard. It falsely states that Plaintiff simply "wanted to go home" and "made no attempt to notify his supervisor or to leave word as to why he needed to leave". Though unsupported by facts, the warning states that Plaintiff was not permitted to "alter or change his schedule if he feels ill."

76.     Another unwarranted disciplinary warning was issued on January 4, 2011 for events on December 26, 2010. The disciplinary warning acknowledges corroboration of Plaintiff's exculpatory explanation, yet Plaintiff was still subjected to disciplinary action.

77.     On January 20, 2011, the Union sent a letter to Hampshire House Managers objecting to the continued harassment of Plaintiff and requesting that the unwarranted disciplinary warnings be rescinded.

78.     On February 2, 2011 Mr. Lappin informed the Union that he would not rescind the disciplinary warnings.

79.     On March 21, 2011 a disciplinary warning was written for Plaintiff's alleged use of the gym. The warning was never delivered to Plaintiff but was put in his file. Prior to the warning, Plaintiff and other employees used the gym without penalty. Mr. Lappin has since granted Caucasian and Hispanic employees permission to use the gym. Upon information and belief, at least one light-skinned employee still regularly uses the gym and has never been disciplined for it.

80.    At the end of March 2011, Plaintiff was forced to take medical leave from Hampshire House because of a flair up of degenerative conditions in his knees. This had also occurred previously in 2005 and in 2009. One Caucasian engineer who has similar problems had also taken medical leave on several occasions.

81.    Upon information and belief, Mr. Lappin and Mr. Kaplan agreed to have Plaintiff followed by private investigators. Upon information and belief, by the end of August 2011, Hampshire House paid more than $4,000 for surveillance of Plaintiff.

82.    At or about 4:30 a.m. on June 8, 2010, a private investigator posted outside of Plaintiff's home in Old Bridge, New Jersey, followed Plaintiff as he was leaving for work in his car. Investigators photographed Plaintiff during his lunch hour. Upon information and belief, investigators entered the building where Plaintiff was working with Pace Plumbing Corp., and asked whether Plaintiff was working there. One marshal confirmed that Plaintiff was there but denied the investigators' requests to copy the security log and to "gain access to the worksite".

83.    At least one marshal informed Plaintiff that investigators informed the marshals that they were police officers, showed a federal marshal a badge and falsely told the marshal that they had a warrant for Plaintiff's arrest. Upon information and belief, marshals informed the investigators that they could not serve a state arrest warrant on federal property. There are and were no warrants for Plaintiff's arrest.

84.    Plaintiff had worked with Pace Plumbing Corp. at that location for some time and had enjoyed a cordial, even friendly, relationship with the marshals. As a result of the investigators' actions and false statements, Plaintiff suffered humiliation and damage to his reputation. Marshals who had previously been friendly to Plaintiff

began to treat Plaintiff differently and Plaintiff perceived that some marshals

regarded him, thereafter, with suspicion.

Plaintiff was very disconcerted by these events because he was unaware that

Defendants had hired private investigators to follow him and he knew that there was

no warrant for his arrest. Plaintiff suffered additional stress and anxiety because he

did not know if or when the purported officers would return to the location or what

they would do if they did return.

85.    On June 21, 2011 Hampshire House issued a termination letter to

Plaintiff for "falsification of official company documents". The termination letter was

sent to Plaintiff, who was still on medical leave from Hampshire House.

86.    On July 6, 2011, Mr. Lappin met with representatives of the union

before an official Arbitrator. Upon information and belief, Mr. Lappin alleged that, by

submitting forms on which his doctor had checked an option stating that Plaintiff

would not be able to return to work until his next evaluation, Plaintiff falsified

company documents. Defendants had not previously asked Plaintiff for more

information about his condition, for more documentation from his doctor, or about

whether he still had his daytime job.

87.    Upon information and belief, Mr. Lappin falsely said, during the

meeting, that he had had no idea that Plaintiff had another job until informed of it by

North Shore Investigations, Inc. The Arbitrator determined that Defendants did not

have sufficient cause to terminate Plaintiff.

88.    Thereafter, while Plaintiff was still on medical leave, Plaintiff heard

from other employees at Hampshire House that Mr. Lappin was making plans to get

rid of the part-time shift at Hampshire House, which would mean that Plaintiff would have to work daytime hours during the week. Upon information and belief, Mr. Lappin did this because his attempt to have Plaintiff terminated on the trumped up charge of "falsifying company documents" was unsuccessful. Defendants' hope was that the schedule change would force Plaintiff to leave his position at Hampshire House.

89.    When Plaintiff returned to work, Defendants notified him of the schedule change. Under the CBA, the schedule change could not go into effect until two weeks after Plaintiff came back from leave. Plaintiff notified Hampshire House managers that he would be forced to resign if they scheduled him for daytime hours during the week.

90.    Despite the full knowledge that Plaintiff would need to resign if he was required to work daytime hours for the Hampshire House during the week, Defendants refused to halt the shift change. On September 20, 2011 Plaintiff could not work the new schedule that was assigned to him. By requiring that Plaintiff work the new shift, Defendants constructively discharged Plaintiff from his position at Hampshire House.

91.    Upon information and belief, Defendants did not need Plaintiff to cover the new shifts for which Defendants wanted to schedule him. After Plaintiff left his position, Hampshire House did not hire another employee to fill those shifts. Defendants simply rearranged the schedules of the other engineers employed by Hampshire House.

92.     Upon information and belief, as a result of the new schedule, Hampshire House then had a skeleton crew in the Engineering Department. This necessitated, and continues to necessitate, that Hampshire House pay more overtime than previously. Under the new schedule, Defendants paid, and continue to pay, Mr. Malec overtime pay for working through his lunch hour every Thursday. Additionally, because all engineers were then, and are now, full-time employees, and because Hampshire House does not hire outside contractor help, Defendants must pay overtime to Hampshire House engineers to cover the shift of any other engineer who takes a sick day, a personal day, a vacation day, or is absent or late for any other reason.

93.     After Plaintiff's resignation, Mr. Lappin told Paul Malec words to the effect of, "I got rid of . . . and I got rid of Bruce. I'm doing good." Mr. Malec told Plaintiff, that Mr. Lappin had started picking on Clarence, another African-American man who worked as a housekeeper at Hampshire House.

94.     Mr. Lappin and Mr. Kaplan sought to discipline and did cause discipline to be imposed on Plaintiff on account of his race and/or color, and they retaliated against Plaintiff for objecting to these discriminatory practices.

95.     But for his race and color, Defendants would not have treated Plaintiff as poorly as they did.

## CLAIMS FOR RELIEF:

### FIRST CLAIM FOR RELIEF
### DISCRIMINATION BASED ON RACE AND/OR COLOR IN VIOLATION OF TITLE VII

96.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 95 of this Complaint with the same force and effect as if fully set forth herein.

97.    In violation of Title VII, Defendants subjected Plaintiff to discrimination and harassment based on race and/or color, and to a hostile work environment.

98.    In taking the above described discriminatory actions, Defendants acted with malice and reckless indifference to Plaintiff's rights under Title VII.

99.    Plaintiff has lost wages, other benefits and compensation, has suffered and continues to suffer mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendants' discriminatory practices.

### SECOND CLAIM FOR RELIEF
### DISCRIMINATION BASED ON RACE IN VIOLATION OF 42 U.S.C. §1981

100.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 95 of this Complaint with the same force and effect as if fully set forth herein.

101.    In violation of  42 U.S.C. §1981, Defendants subjected Plaintiff to discrimination and harassment based on race.

102.    In taking the above described discriminatory actions, Defendants acted with malice and reckless indifference to Plaintiff's rights under 42 U.S.C. §1981.

103.    Plaintiff has lost wages, other benefits and compensation, has suffered

and continues to suffer mental anguish, emotional distress, humiliation and other

compensable injuries as a result of Defendants' discriminatory practices.

## THIRD CLAIM FOR RELIEF
### DISCRIMINATION BASED ON RACE AND/OR COLOR IN
### VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE

104.    Plaintiff repeats and realleges each and every allegation contained in

paragraphs 1 through 95 of this Complaint with the same force and effect as if fully

set forth herein.

105.    In violation of the New York City Administrative Code, Defendants

subjected Plaintiff to discrimination and harassment based on race and/or color.

106.    In taking the above described discriminatory actions, Defendants acted

with malice and reckless indifference to Plaintiff's right under the Administrative

Code.

107.    Plaintiff has lost wages, other benefits and compensation, has suffered

and continues to suffer mental anguish, emotional distress, humiliation and other

compensable injuries as a result of Defendants' discriminatory practices.

## FOURTH CLAIM FOR RELIEF
### RETALIATION IN VIOLATION OF TITLE VII

108.    Plaintiff repeats and realleges each and every allegation contained in

paragraphs 1 through 95 of this Complaint with the same force and effect as if fully

set forth herein.

109.    In violation of Title VII, Defendants subjected Plaintiff to retaliation,

including by constructively discharging him, for opposing Defendants' discriminatory

treatment.

27

110.   In taking the above described retaliatory actions, Defendants acted with malice and reckless indifference to Plaintiff's rights under Title VII.

111.   Plaintiff has lost wages, other benefits and compensation, has suffered and continues to suffer mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendants' retaliatory practices.

**FIFTH CLAIM FOR RELIEF**
**RETALIATION IN VIOLATION OF 42 U.S.C. §1981**

112.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 95 of this Complaint with the same force and effect as if fully set forth herein.

113.   In violation of 42 U.S.C. §1981, Defendants subjected Plaintiff to retaliation, including by constructively discharging him, for opposing Defendant's discriminatory treatment.

114.   In taking the above described retaliatory actions, Defendants acted with malice and reckless indifference to Plaintiff's rights under 42 U.S.C. §1981.

115.   Plaintiff has lost wages, other benefits and compensation, has suffered and continues to suffer mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendants' retaliatory practices.

**SIXTH CLAIM FOR RELIEF**
**RETALIATION IN VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE**

116.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 95 of this Complaint with the same force and effect as if fully set forth herein.

117.    In violation of the New York City Administrative Code, Defendants subjected Plaintiff to retaliation, including by constructively discharging him, for opposing Defendant's discriminatory treatment.

118.    In taking the above described retaliatory actions, Defendants acted with malice and reckless indifference to Plaintiff's rights under the Administrative Code.

119.    Plaintiff has lost wages, other benefits and compensation, has suffered and continues to suffer mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendants' retaliatory practices.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that a judgment be granted as follows:

a.    Declaring the acts and practices complained of herein to be violations of Title VII, 42 U.S.C. §1981, and the New York City Human rights Law;

b.    Enjoining and permanently restraining these violations of law;

c.    Directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

d.    Directing defendants to place Plaintiff in the position he would have occupied but for Defendants' unlawful conduct, and making him whole for all earnings and other benefits he would have received but for Defendant's unlawful conduct, including but not limited to wages, commissions, other lost benefits, loss of good will, and interest theron;

e.     Directing Defendants to pay Plaintiff compensatory damages, including

damages for his mental anguish, denial of life's pleasures, pain and suffering and

humiliation, and damage to reputation;

f.     Awarding Plaintiff the costs of this action together with reasonable attorney

fees, as provided by § 706(k) of Title VII, 42 U.S.C. §2000e-6(k);

g.     Directing Defendants to pay punitive damages; and

h.     Granting such other relief as this Court deems necessary and proper.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff

respectfully demands that this proceeding be tried to a jury.

Dated:     New York, NY
          August ____, 2012

                                    Respectfully Submitted

                         By:

                                    Felicia Nestor
                                    1501 Broadway, 12th Floor
                                    New York, NY 10036
                                    fn@fnestorlaw.com
                                    (646) 571-2214 Phone
                                    (866) 407-5277 Fax

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5ᵗʰ Floor
New York, NY 10004-2112
(212) 336-3620
TTY (212) 336-3622
FAX (212) 336-3625

Bruce Jones
28 Appleby Avenue
Old Bridge, NJ 08857

Re:    EEOC Charge # 520-2012-00556
       *Bruce Jones v. Hampshire House*

Dear Mr. Jones:

The Equal Employment Opportunity Commission (hereinafter referred to as the "Commission")
has reviewed the above-referenced charge according to our charge prioritization procedures.
These procedures, which are based on a reallocation of the Commission's staff resources, apply
to all open charges in our inventory and call for us to focus our limited resources on those cases
that are most likely to result in findings of violations of the laws we enforce.

In accordance with these procedures, we have examined your charge based upon the information
and evidence you submitted. You allege that you were discriminated against based on your race,
color and retaliation.

Based upon a review of the documents received, the Commission is unable to conclude that the
information establishes a violation of Federal law on the part of Respondent. This does not
certify that Respondent is in compliance with the statutes. No finding is made as to any other
issue that might be construed as having been raised by this charge.

The Commission's processing of this charge has been concluded. Included with this letter is your
Notice of Dismissal and Right to Sue. Following this dismissal, you may only pursue this matter
by filing suit against the Respondent named in the charge with 90 days of receipt of said notice.
Otherwise, your right to sue will be lost.

Any questions regarding this matter can be directed to Senior Investigator Donna M. Walcott by
telephone at 212-336-3677, by fax to (212) 336-3624 or by email communication to
donna.walcott@eeoc.gov.

Sincerely,

                                    for                    MAY 19 2012

Kevin J. Berry                                             Date
District Director

cc:    Charging Party's Attorney (Felicia Nestor, Esq.)

EEOC Form 161 (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| To | Bruce Jones<br>28 Appleby Avenue<br>Old Bridge, NJ 08857 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|
| **EEOC Charge No.** | **EEOC Representative** | | **Telephone No.** |
| 520-2012-00566 | Donna M. Walcott<br>Senior Investigator | | (212) 336-3679 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice, or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*Kevin J. Berry* (signature)

MAY 19 2012

Enclosures(s)

Kevin J. Berry
District Director

*(Date Mailed)*

cc.  **HAMPSHIRE HOUSE**
**Respondent's Attorney**
Steven D. Hurd, Esq.
PROSKAUER ROSE, LLP
Eleven Time Square
New York, NY 10036

**CHARGING PARTY'S ATTORNEY**
Felicia Nestor, Esq.
FELICIA NESTOR ESQ.
1501 Broadway
12th Floor
New York, NY 10036